William M. Kelly v. Commissioner.
Kelly v. Commissioner
Docket No. 7295.
United States Tax Court
1947 Tax Ct. Memo LEXIS 188; 6 T.C.M. (CCH) 646; T.C.M. (RIA) 47252; June 12, 1947
Louis P. Eisner, Esq., 580 Fifth Ave., New York 18, N.Y., for the petitioner. John Mahoney, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income taxes for the calendar years 1938, 1939, 1940 and 1941 in the respective amounts of $721.69, $1,215.03, $1,575.44 and $2,932.09. The issue with respect to all years involved is whether amounts received by petitioner resulting from the disposition of patents or inventions are capital gains or ordinary income. Findings of Fact Petitioner is an individual residing at Westfield, New Jersey. He filed his income tax returns for all the years before us with the collector of internal revenue for the fifth district of New Jersey. Petitioner was first employed by the American Type Founders *189 Co. in 1894, as a compositor. He later became foreman of its ready print and typesetting departments, and by 1912 had become a traveling representative of the company. During 1910, 1911 and the early part of 1912, petitioner invented some improvements in printers' typesetting and distributing machines, on which he secured patents. He assigned these patents to the corporation in 1912, voluntarily, and without any request for compensation therefor. However, the corporation made him an award of $500. By 1912, and also during the time he was employed by the corporation, petitioner completed a working model of a printing press, which came to be known as the Kelly Press. The President of the corporation and petitioner conferred about the possibilities of the new press, and petitioner was authorized to proceed with its development, the expenses of which would be borne by the company. Petitioner applied for patents on the press and a feeding machine designed for use with the press. On September 19, 1913, he entered into a contract with the company, relating to the press, and on September 23, 1913, he entered into a contract with the company relating to the feeding machine. These contracts *190 are in all essential respects similar except for the different subjects to which they refer. Each of the contracts contains a provision that petitioner was employed as an inventor of certain machinery of a type dealt in by the company, and that it was desired to cause legal title to his inventions to be "vested in and secured to" the company by proper and formal "assignments, conveyances and covenants", and to provide for royalty payments to petitioner. It was also provided that petitioner thereby "sells, assigns nad transfers unto the said Company the full and exclusive rights" to the inventions involved and of all letters patent and applications, domestic and foreign. Each then contained the further provision that for the period of 17 years immediately thereafter the company should have the exclusive right to make, use and sell the inventions and improvements, with payment of the royalty therein stipulated, and to license others to make, use and sell upon payment of royalty to petitioner, and that, after the expiration of the 17-year period, the company should continue to have a general right and license under the patents, without payment of royalty, petitioner to have the right *191 thereafter to designate other licensees to whom the company would at his direction issue licenses. Both contracts contained a general provision for the employment of petitioner at a salary to be agreed upon. By his 1913 contract petitioner agreed to transfer to the company for the same period all future inventions and improvements of the type covered, and the evidence indicates that he did so. He transferred in all more than fifty inventions, improvements, applications or patents. In 1926, several years prior to the expiration of the 17-year period specified in the 1913 agreements, the corporation applied to a banking firm for a loan of $6,000,000, largely for the purpose of constructing a factory for the manufacture of the Kelly Press in Elizabeth, New Jersey. The bankers refused to extend the credit on the ground that the company did not own the patents under which the machines were to be manufactured, but had an exclusive license only for a period of approximately three more years. Consequently, as of December 1, 1926, petitioner and the company entered into another contract, whereby petitioner sold outright all of the petitioner's right, title and interest, legal and equitable, *192 in and to the patents and inventions and later improvements thereon. The name "Kelly" had become extremely valuable between 1913 and 1926, in connection with presses and attachments, and the right to the use of the name was also conveyed by the 1926 agreement. The purchase price provided for in the agreement of 1926 was to be paid in annual installments over 20 years beginning November 30, 1926, expring November 30, 1946. The amount thereof was to be computed on the basis of the corporation's gross sales, but it was agreed that the average annual payments for any three successive years should not fall below $20,000 per year, otherwise petitioner should "have the right to manufacture under his inventions and patents which he has assigned to the company pursuant to this agreement". It was also provided that if the company should discontinue for a period of two years the manufacture and sale of printing presses or attachments (except automatic jobber) the company would, upon request, reassign the patents or applications relating thereto. The same contract provided for the employment of petitioner by the corporation as a consulting and supervising engineer, for a period of 10 years, *193 at an annual salary of $7,500. Pursuant to this contract, petitioner received $20,000 per year as installments of the sales price agreed upon, through the year 1930. In 1931, the company defaulted in its payments of royalties to petitioner which default continued until October, 1935. After the default occurred, petitioner claimed the right to repossess the patents and trade name, but the corporation disputed the claim. On October 4, 1933, the corporation filed a voluntary petition in bankruptcy in the United States District Court for the District of New Jersey. In December of 1934, it filed its petition under Section 77-B of the National Bankruptcy Act, with the view of effecting a reorganization. On October 8, 1935, petitioner and the corporation resolved their controversies by means of a new agreement entered into on that date. By the 1935 contract, petitioner again sold, assigned and transferred to the corporation the full and exclusive rights to all the patents to which we have heretofore referred. The company agreed to pay to petitioner the sum of $26,500 in full satisfaction of past-due royalties, and to pay as royalties the sum of $14,000 per year for ten years beginning *194 October 1, 1935, plus 1 1/2% of total gross sales in foreign countries. This contract specifically provided for repossession in the event of default. A provision was included for the continued employment of petitioner as consulting and supervising engineer, at a salary of $7,500 per year, until December 31, 1935. During all the period referred to, petitioner's employment with the company had continued, and the company had never defaulted in the payment of his salary. Petitioner was never employed by any other person or corporation from 1894 through 1935, nor did he engage in any other business or occupation at any time. During the entire period, petitioner never made any effort to sell, assign, or license, nor did he sell, assign or license, any patent, invention or trademark, or application therefor or improvement thereon, to anyone other than his employer corporation. He devoted his full time and effort to the business for which he was employed. He retired from his employment in 1935. The provisions of the 1935 contract are still in effect and have been duly carried out and petitioner has received the amount provided for in each of the years since then, including the years *195 1938, 1939, 1940 and 1941 involved here. The corporation capitalized the payments as the cost price to it of the patents. Petitioner has secured two patents which were not included in those assigned to the corporation. He has never disposed of these, and in 1938 he took a depreciation allowance in his income tax return on one of these two. The inventions, and the patents secured thereon, were not property held by petitioner primarily for sale to customers in the ordinary course of his business, or property used in his trade or business of a character which was subject to an allowance for depreciation. They were capital assets. Opinion KERN, Judge: The single question before us concerns the proper treatment for tax purposes of the amounts received by petitioner in each of the tax years involved, pursuant to his 1935 contract with his employer corporation. Petitioner treated them in each year as capital gains. Respondent argues that they were, in each year, ordinary income, and makes alternative contentions with respect thereto. It is the respondent's position, first, that all the inventions made by petitioner during the period of his employment by the corporation were, from *196 the first, the property of the corporation by reason of the contract of employment. Therefore, respondent contends, there were no sales or exchanges of capital assets and the amounts paid to petitioner purportedly as the sales price of the inventions or patents, were, in reality, wages. It should, perhaps, be made clear, at this point, that respondent does not contend, nor is there any basis in the record for contending that petitioner was a substantial shareholder or otherwise in position to influence the conduct of the corporation's business affairs. It may therefore be safely assumed that the transactions between petitioner and the corporation were at arm's length in all respects. Respondent asserts that petitioner was employed as an inventor, and that the inventions made by him were therefore automatically the property of his employer. The fact is that petitioner was not originally employed as an inventor, but as a compositor, later as foreman, and still later as a traveling representative. It was during the period when he was employed in these capacities that he received and executed his first invention, which he voluntarily transferred to his employer, and for which his employer *197 paid him, on its own initiative, $500. Later on, he built his first model of a printing press. It was this model which so impressed the president of the corporation that he agreed to pay the costs of its further development and entered into a contract with the petitioner for his employment as an inventor to perfect the press, and for its exclusive use by the corporation when finished. It is evident that at the time he first became employed as an inventor, he had already completed the working model of what was to be his basic and most important invention. The company wished to acquire this invention and other inventions which it seemed probable that petitioner would make in development of his basic invention. The parties dealing at arm's length with no suggested thought of tax consequences, entered into a contract whereby petitioner was paid reasonable wages or salary for his work, and was also paid amounts as consideration for the acquisition by the company of the patent rights here involved. It is obvious that the corporation did not consider itself already the owner of the patents, without the necessity of acquiring them from petitioner, and there is nothing in the record which persuades *198 us that it was. See Ellis, Patent Assignments & Licenses, p. 133, and cases cited. Petitioner was paid his specified salary pursuant to the contract, in addition to the royalties paid him pursuant to the 1913 agreement, and we are of the opinion that the amounts paid as royalties were not in the nature of additional wages, as respondent suggests. We conclude that respondent's first contention is not supported by the facts presented by the record. Respondent's alternative contention is that the patents were not capital assets in the hands of petitioner, and that the receipts from the sale thereof are therefore not taxable at the capital gains rate. The applicable statutory provisions are contained in section 117 (a) (1) of the Internal Revenue Code: "(1) Capital Assets. - The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1) *199 * * *." Under this statute respondent claims "petitioner was engaged in the trade or business of being an inventor holding property that is subject to an allowance for depreciation, primarily for sale to a customer in the ordinary course of such business." In this connection, it should be pointed out that Section 23 (1) of the Code provides a reasonable allowance for the exhaustion, wear and tear, only of property used in the trade or business, or held for the production of income. Property held primarily for sale is not, therefore, subject to an allowance for depreciation. There is no suggestion in the record that petitioner used these patents in any business of his own or held them, during any of the years referred to, certainly not after 1926, for the production of income. Our sole inquiry, then, is as to whether petitioner held them primarily for sale to customers in the ordinary course of his business. The evidence shows that at no time did petitioner ever attempt to sell or license his patents to anyone other than the corporation which employed him. After his 1913 contracts, covering his two basic inventions, were executed, he was obligated to grant to his employers at *200 least an exclusive license to all his later improvements over a long period of time. He was not, as to all his later inventions and improvements, free to sell them to any customer. His 1913 contracts extended to 1930 and before they expired he made a complete and final disposition by way of sale, of all such patents and inventions. Although he claimed the right to repossess, by virtue of the company's default in 1931, and subsequent years, his claim was disputed. Certainly no formal retransfer of title ever took place, and there was never any judicial determination of his right to recapture the property. The dispute was finally settled by a further contract in 1935. It can scarcely be argued that he held, during any of that period, a clear or salable title to the disputed patents. We do not believe, under these facts, it can be said that petitioner at any time held these patents primarily for sale to customers in the ordinary course of his business, whether it be contended the sale took place in 1913, 1926 or 1935. Aside from this basic fallacy in respondent's position on this point, there are other facts present in this case which distinguish it from Harold T. Avery, 47 B.T.A. 538, *201 upon which case respondent lays great stress. In that case the Commissioner's argument was to the effect that the taxpayer was engaged in the business of inventing and selling patents outside of and in addition to his regular employment, that he was in no way obligated to transfer the inventions and patents to his employer, and that he had disposed of five inventions or patents to three different purchasers prior to the disposition there in question. Here the inventions were not made in the course of a business independent of petitioner's employment, the employer, after 1913, did have certain rights to them even though ambiguous, and the petitioner made no sales or efforts to sell to persons other than his employer. Some reference is made to the fact that petitioner secured one patent which he did not sell, and on which he claimed a depreciation allowance in 1938. That patent, of course, is not involved here. He retired from his employment with the American Type Founders Company at the end of 1935. We have before us no evidence concerning his activities after 1935, or the use made of that one patent on which he claimed a depreciation allowance in 1938. If he used that patent in *202 a trade or business carried on by him at that time, he would be entitled to the depreciation allowance, but it would not affect the facts surrounding patents which he did not use in his trade or business, but instead, sold. On the issue presented by the pleadings, we conclude that respondent is in error. Decision will be entered under Rule 50.